## MANUFACTURERS TECHNOLOGIES, INC., Plaintiff,

v.

## CAMS, INC., Edward Cormier, Kenneth Laviana, Norman St. Martin, Defendants.

### Civ. No. N–85–253(TFGD).

United States District Court,
D. Connecticut.

June 30, 1989.

---

Malcolm Chisholm, Jr., Donald Holland, Longmeadow, Mass., for plaintiff.

Donald Hayes, William Reinsmith, Springfield, Mass., for defendants.

## MEMORANDUM OF DECISION

DALY, District Judge.

This matter is before the Court for a determination of the amount of damages, if any, the plaintiff is entitled to recover as a result of the Court's liability decision in *Manufacturers Technologies, Inc. v. Cams, Inc.*, 706 F.Supp. 984 (D.Conn.1989) ("*MTI I*"). In that decision, this Court held that the defendants infringed the plaintiff's screen display and computer program copyrights, violated section 43 of the Lanham Act, 15 U.S.C. § 1125, and also violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–110b(a).[1] Because this matter was bifurcated, the damages trial was heard by the Court on May 31, 1989 and June 1, 1989.

## BACKGROUND AND FINDINGS OF FACT

Plaintiffs and defendants are in the business of selling computer programs designed to assist in the cost calculation or cost estimating a manufactured part. The market for their products consists of roughly 100,000 "job shops," parts manufacturers, and other companies that manufacture machine parts.

After several years of development, plaintiff's "COSTIMATOR" computer program was introduced to the marketplace on or about January 1984. After two years of steady sales in 1984 and 1985, in 1986 and 1987 the sales of COSTIMATOR, plaintiff's only significant product, rose dramatically. Over this four year period as COSTIMATOR gained in market recognition its annual sales rose from 30 units to 93 units. Though modest, these sales are significant in view of COSTIMATOR's retail price. Initially sold for $6000 to $7000 in 1983, COSTIMATOR's price was increased to just under $19,000 in 1984 and then increased to around $19,800 in the Spring of 1988. These sales are also significant because plaintiff, although a relatively young and small company, was one of several pioneers in developing a sophisticated computer-aided cost estimating program.

Plaintiff and defendants have stipulated that plaintiff's gross profit per sale of COSTIMATOR, after the initial price increase, was approximately $13,800.

Plaintiff's COSTIMATOR program has received favorable reviews in the trade press and in the marketplace in general on account of the ease with which it enables a user to develop an accurate estimate of the cost of manufacturing a part. Plaintiff has expended substantial sums in advertising and promoting its COSTIMATOR program. Despite its favorable reception in the marketplace and the rapid rate of growth of its sales in 1985, 1986, and the first half of 1987, COSTIMATOR's sales began to decline in the second half of 1987 all the way through the end of May 1989. For example, in 1988 plaintiff sold only 70 units, and through May 26, 1989 plaintiff's sales amounted only to 31 units. For 1988 alone, plaintiff had projected 150 sales. Plaintiffs and defendants have also stipulated that the defendants infringement of plaintiff's program and screen displays commenced in February 1985. It continued through January 30, 1989 the date of the Court's liability decision and the point in time when the Court permanently enjoined the sales of defendants' infringing computer programs, QUICK COST ("QC") III, V, and X, and RAPIDCOST ("RC") 1, 2, and 3.

During the period of 1985 through the end of 1988, the defendants sold eighty-six QC III, V, and X and RC 1, 2, and 3 programs (not counting those programs that were sold but later returned). From mid–1986 through mid–1987, sales of defendants' programs grew at an increasing rate. However, like plaintiff's COSTIMATOR sales, after mid–1987 defendants' sales declined. For 1986, 1987, and 1988, the defendants sold 23, 34, and 19 units in each respective year. The retail prices of defendants' programs range from approximately one to twenty percent of the retail price of COSTIMATOR. Twenty-two of the defendants programs were returned by their purchasers. These returns were not only fostered by the defendants' liberal "no questions asked" return policies, but also

---

1. Familiarity with the Court's decision in *MTI I* is presumed.

caused by dissatisfaction with the performance of these programs.

As noted in *MTI I*, the defendants' promotional brochures advertising the QC and RC programs at issue falsely ascribed several capabilities to the programs that they did not in fact perform. 706 F.Supp. at 1003. At the damages trial, both defendants Cormier and St. Martin again admitted that their programs never could perform these capabilities. Each also testified and offered other evidence, however, that shortly after plaintiff's lawsuit was commenced in June 1985 they took steps to ensure that the capabilities charts were either reprinted or appropriately marked to reflect only the capabilities that the programs could actually perform. Cormier also candidly admitted that prior to using the reprinted brochures he sent out the remaining incorrect brochures and that he may or may not have crossed out the false capabilities listed therein. The defendants also used two other methods to advertise their programs. First, they made relatively limited expenditures to purchase relatively small advertisements of roughly one to two square inches in various trade publications. Second, CAMS advertised and sold its programs through a distributor, ABR Business Machines Corporation ("ABR"), which published and distributed a catalog with, *inter alia*, full page advertisements of the defendants' programs. This catalog, with a circulation of 60,000 to 80,000, was twice distributed by ABR with the full page advertisement of defendants' product to substantial segments of the market for these types of programs.

The market for defendants' and plaintiff's programs overlapped to a significant extent. But though not readily quantifiable, the price differential between the programs did set them apart. However, there was also a perception fostered by defendants' advertising efforts and capabilities charts that defendants' programs performed substantially the same functions as COSTIMATOR for a fraction of the price. This perception was confirmed by the testimony of several customers. One customer, Michael Stan, testified that defendant Cormier told him about his prior involvement with the plaintiff as a sales representative and that he struck out on his own to market a software program "that would do the same thing [as COSTIMATOR] for a fraction of the price." Cormier denies making such a statement.

By way of example, though small or midsize cars are not the same as large luxury automobiles, they both compete for consumers seeking transportation by automobile. Some consumers are simply not able to make the outlay to purchase a luxury automobile, while others who are able might jump at the chance to get a bargain which may or may not perform as well. In part, the evidence in this case comports with this simplistic example. Yet, the market for computer cost estimating software is different from the market for automobiles. First of all the number of competing programs and hence the opportunity for selection is more limited. Plaintiff's and defendants' witnesses have estimated that there are anywhere from six to twenty-four computer cost estimating programs presently on the market. Second, despite the price disparity between plaintiff's and defendants' program, various trade publications have listed and examined both as part of comparisons of cost estimating programs. A reasonable inference from such comparisons is that plaintiff's and defendants' programs compete with one another. In response to a recent trade magazine article listing fourteen computer cost estimating programs, including defendants' and plaintiff's, defendant St. Martin admitted receiving "a ton of inquiries...."[2] The fact that defendants were still promoting their infringing programs as late as

---

**2.** For the record, the Court notes, as it did in the liability decision, 706 F.Supp. at 989 n. 6, that defendant St. Martin's testimony contains troubling irregularities that go directly to his credibility. This time, in response to a question about the structure of various corporations with which he is affiliated, St. Martin testified that

Chempro Data Sciences Corp. is a subsidiary of a Massachusetts corporation, STM Corp. This conflicts with his testimony at the liability trial and with the findings of fact submitted by his attorneys after that trial stating that NSM Corp. is the parent of Chempro Data Sciences Corp.

October 1988 is also significant in view of St. Martin's testimony that he quit selling RC 1, 2, and 3 in October 1986.

Plaintiff has put on customer testimony which the Court finds very compelling. At both trials, plaintiff put on customer testimony and other evidence indicating that purchases of COSTIMATOR were either delayed, put off indefinitely, or cancelled entirely, as a result of exposure to defendants' program. For example, Thomas Mitchell testified that his company's order for COSTIMATOR was held in abeyance while he purchased, tested, and ultimately rejected the QC program. Similarly, after sending payment for its purchase of COSTIMATOR, TFC Textron cancelled its order and bought the defendants' infringing program. Another customer who eventually bought COSTIMATOR testified that while recognizing the price disparity his company initially purchased QC thinking (by way of example) that one "could buy a clone version of a personal computer for a fraction of the name brand." An inference to be drawn from such testimony and confirmed by Robert Correa was that customers knowing of the similarity between plaintiff's and defendants' programs and the dissimilarity in their price thought that they "were being taken" by plaintiff. The substantial similarity between the programs also worked to plaintiff's disadvantage when purchasers of defendants' programs were dissatisfied because this sometimes resulted in wariness or downright refusal to try or investigate similar programs like COSTIMATOR and other cost estimating programs. Finally, customer Robert Correa testified he thought that, based on the copyright notice placed on the QC III program and materials, he was buying a program that originated with the defendants. In view of this Court's holding of copyright infringement, that assumption was incorrect.

## CONCLUSIONS OF LAW

### A) DAMAGES FOR COPYRIGHT INFRINGEMENT

There is no dispute that plaintiff failed to register his copyrights prior to the defendants' infringements. Therefore, plaintiff is not entitled to recover statutory damages or attorneys' fees for the infringement of its COSTIMATOR copyrights. *See* 17 U.S.C. § 412(2); *Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 670 F.Supp. 1133, 1138 (E.D.N.Y.1987), *aff'd mem.*, 862 F.2d 304 (2d Cir.1988). Accordingly, plaintiff seeks actual damages and profits under 17 U.S.C. § 504(b) which provides:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

■ Although the statute does not define what constitutes actual damages, it has been interpreted to mean the extent to which the market value of the copyrighted work has been injured or destroyed as a result of and during the time of the infringement. *Fitzgerald Pub. Co. v. Baylor Pub. Co.*, 807 F.2d 1110, 1118 (2d Cir. 1986) (citing 3 *Nimmer on Copyright*, § 14.02 at 14–6 (1986) (hereinafter "*Nimmer*")). Though there are various methods for calculating the injury to market value, *see, e.g., Taylor v. Meirick*, 712 F.2d 1112 (7th Cir.1983); *see also Stevens Linen Assoc. v. Mastercraft Corp.*, 656 F.2d 11 (2d Cir.1981); the Court chooses, based on all the evidence, and the plaintiff's proof is directed at, a calculation equating plaintiff's damages with the profits it would have accrued but for defendants' infringement. *See Fitzgerald*, 807 F.2d at 1118; 3 *Nimmer* § 14.02[A] at 14–8 (1989).

■ Plaintiff's theory of damages, which the Court finds persuasive, is as follows. Based on its expert's calculation, plaintiff estimates that as a result of defendants' infringing software it lost 43 plus or minus 17 sales, providing a loss sale range of 26

to 60 sales.[3] Plaintiff's theory, which is amply supported by the evidence, is that it suffered two primary injuries from the infringement. The first injury is sales lost to the defendants. The second injury, although more diffuse, is the more substantial and serious damage to plaintiff's product flowing from the perception that: 1) programs functionally equivalent to plaintiff's COSTIMATOR program were available at a small fraction of the COSTIMATOR price; 2) as compared to defendants' programs, COSTIMATOR was overpriced and therefore plaintiff was price gouging; and 3) because defendants' programs did not perform as anticipated, plaintiff's similar looking program must also perform poorly and all cost estimating computer programs are a bad investment. In effect, plaintiff's COSTIMATOR was victimized in a relatively new and fragile market by the "negative word of mouth" flowing from defendants' programs and was therein tarred by association. As testified to by Professor Todd, the effect of this negative word of mouth is next to impossible to quantify with respect to sales made to small companies, but more readily identifiable with respect to sales made to large companies. Towards this end he noted both plaintiff's word-of-mouth sales in different divisions of large companies such as General Electric, G.T.E., and Pratt & Whitney, and also noted defendants' sales to large companies such as Xerox, Ingersoll–Rand (Canada), Morton–Thiokol, Robins Air Force Base, Blaw–Knox, Babcox and Wilcox, and Eastman Kodak.

As noted by plaintiff's damages experts, little changed in either the internal or external conditions of plaintiff's selling environment from 1984–1988. In fact, there is evidence indicating that plaintiff's internal conditions affecting sales, including corporate management, marketing, sales approach, and product improved over this period. Externally, all the variables affecting the selling environment—the status of the economy, interest rates, the industry marketplace, laws and taxes—with the exception of competition, remained relatively stable and without significant change. At or about the time that the defendants established a market presence in 1987, *i.e.,* they began to be known and established in the market, the plaintiff's sales began to fall precipitously. Intuitively, this follows because one would not expect the effect of the infringement to be felt immediately but rather more significantly over time. *See Taylor,* 712 F.2d at 1120–21. At that point, in mid–1987, plaintiff's sales began to fall and continued to decline through 1988. Based on all the evidence before the Court, the plaintiff has shown a causal connection between the lost COSTIMATOR sales and the infringement in the range described by plaintiff's expert. The burden now shifts to the defendants to show that the sales decline was the result of some other cause not related to the infringement. *Harper & Row Pub., Inc. v. Nation Enterprises,* 471 U.S. 539, 567, 105 S.Ct. 2218, 2234, 85 L.Ed.2d 588 (1985).

The defendants attacked the plaintiff's infringement damages analysis arguing that: 1) plaintiff's and defendants' programs are dissimilar and do not compete in the same market; 2) plaintiff's damage theory fails to adequately take into account other competitors sales of cost estimating programs; 3) the plaintiff's analysis fails to take into account the stock market crash of October 1987; and 4) the plaintiff's gross profit calculation, which defendants stipulated to, fails to take into account fixed costs such as rent, research and development costs, and other general and administrative expenses lumped together as overhead. In view of the substantial weight of the evidence to the contrary, the Court will not consider the contention that

---

**3.** Using two relatively conservative alternative approaches, one based on sales history used to forecast 1988 sales, the other based on the software acquisition process of large companies, plaintiff's damages expert came to two separate conclusions as to lost sales, which by virtue of their closeness added reliability to his conclusions. Professor Todd's analysis was also significant because it avoided simplistic before-after approaches that have been criticized in the past as offering only slight evidence of infringement. *See Taylor,* 712 F.2d at 1120 (*"post hoc ergo propter hoc* is a naive theory of causation").

the programs are dissimilar.[4] Similarly, defendants' arguments about the deleterious effects of the stock market crash are not persuasive because the sales downturn experienced by both parties began as early as June 1987 and because of the failure to show that this market was unusually susceptible to the crash's after effects. However, the Court does find merit in defendants' claims regarding the market and the number of competitors plaintiff faces.

■ As discussed at some length previously, the market for the infringed and infringing programs overlap. To the extent that defendants' activities have impacted upon a segment of the market which finds COSTIMATOR cost prohibitive, then the damage to the market value of plaintiff's program is very limited. Also, plaintiff's analysis fails to take into account the number of competitors in the marketplace selling cost estimating software and the relative merits of their programs. There is conflicting evidence about the number of competitors. However, Professor Todd's analysis assumed that plaintiff had six competitors, presumably including the defendants. In light of the October 1988 trade article listing some eleven other companies selling computer aided cost estimating programs, the Court infers that the number of competitors has increased. Unfortunately, the defendants have not offered any evidence indicating when these competitors entered the market, or what their sales or relative market shares are. Despite the absence of such information, the defendants essentially ask this Court to

speculate that plaintiff suffered no damage to the market value of its program resulting from defendants' infringement. Rather than doing so, the Court finds that a modest diminution of plaintiff's lost sales is necessary to account for these factors. In light of these factors and the substantial margin of error in plaintiff's calculation of its lost sales, the Court holds that plaintiff has proven that it has lost thirty-five sales during the period of and as a result of the defendants' infringement.

■ Curiously, after stipulating that plaintiff's "gross profit" per unit sale of COSTIMATOR during the period of infringement was $13,800, defendants attack the validity of that figure as an indicator of lost profits.[5] The defendants argue that the cost of advertising, promotion, and selling should also be taken into account in determining lost profits and that to ignore such costs is to overcompensate plaintiff for the harm caused by the infringement.[6] Plaintiff contends that only those costs that directly vary with the sales volume should be included in its lost profit determination. Plaintiff further posits that, because its witnesses testified that the disputed expenses did not decrease as a result of the lost sales and would not have increased if in fact such sales had been made, these fixed "overhead" expenses should not be included in the Court's calculation of lost profits.

Plaintiff's argument, though not without support elsewhere[7], is contrary to the Sec-

4. Furthermore, the Court once again rejects defendants' argument that the infringement was *de minimis* in light of the qualitative nature of the infringement. *MTI I*, 706 F.Supp. at 1001–02. Similarly, the defendants' attempt to raise the defense of innocent intent, *see* 3 *Nimmer* § 13.08 at 13–136, is contrary to this Court's factual findings in *MTI I*, which do not merit reconsideration now. Nor does the Court find persuasive the argument that the defendants' were innocently entangled in the web of a newly developing area of the law.

5. This figure was arrived at by subtracting from the revenue generated by each sale the direct variable costs associated with making that sale including the cost of the digitizer, the cable conductor, the manual and guides, training and lunches, support, diskettes, and commissions.

6. The defendants also argue that costs associated with researching and developing the COSTIMATOR program should also be accounted for in the lost profit analysis. The Court will not consider these costs because they have not been quantified and because these costs were incurred prior to the plaintiff's incorporation and were never accounted for. Any other fixed costs plaintiff might have incurred also were not quantified and little, if any, evidence was put on about such costs.

7. In *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983), the Seventh Circuit persuasively set out the same theory that plaintiff seeks to have this Court apply. Judge Posner, writing for the court, stated, " '[G]ross profits' were real profits in the only sense relevant to damages calcula-

ond Circuit's view of the calculation of lost profits. In the Second Circuit, overhead costs that assist in the production, distribution, or sale of the product must be factored into the profit calculation. *Sygma Photo News, Inc. v. High Society Magazine,* 778 F.2d 89, 93–94 (2d Cir.1985), *aff'g as modified* 603 F.Supp. 829, 831 (S.D.N.Y. 1985); *Wilkie v. Santly Bros., Inc.,* 139 F.2d 264, 265 (2d Cir.1943), *cert. denied,* 322 U.S. 740, 64 S.Ct. 1058, 88 L.Ed. 1574 (1944); *Sheldon v. Metro–Goldwyn Pictures Corp.,* 106 F.2d 45, 54 (2d Cir.1939), *aff'd,* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); *see also Kamar Int'l, Inc. v. Russ Berrie & Co.,* 752 F.2d 1326, 1332 (9th Cir.1984). Though it is not necessarily its burden, the defendant has sufficiently established the linkage between the advertising, promotion, and selling costs incurred in connection with the marketing and sale of plaintiff's only product and the production, distribution, and sale of that product.

■ Because neither the plaintiff nor defendants have offered a method by which to allocate these costs, the Court will allocate them according to the number of sales. From February 1985 through January 30, 1989, the plaintiff incurred $1,167,898 in advertising, promotion, and selling expenses. This sum must be allocated to the two hundred and sixty-nine actual sales and thirty-five sales lost during that same period. When so allocated, each sale must bear $3,841.77 of these costs. Multiplying the thirty-five lost sales by this sum, the Court finds that $134,462 must be further allocated to the lost sales to determine plaintiff's actual damages. Accordingly, after multiplying the thirty-five sales by the "gross profit" stipulation of $13,800 and subtracting out the additional expenses described above, the Court determines that plaintiff is entitled to recover $348,538 in actual damages for the injury to COSTIMATOR's market value as a result of defendants' infringement.

■ Plaintiff also seeks to recover defendants' profits made as a result of the infringement. The recovery of these profits in addition to actual damages is designed to ensure that infringers are not able to retain some benefit flowing from their wrongful conduct that is not fully taken into account in the award of actual damages. *See* 17 U.S.C. § 504(b); *Taylor,* 712 F.2d at 1120; *Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 472 (2d Cir. 1985). Ordinarily, all the copyright owner need do is come forward with some evidence as to the defendants' gross revenues, then under § 504(b) the burden shifts to the infringer to prove expenses to be deducted therefrom in arriving at the calculation of the infringer's profits. *Abeshouse,* 754 F.2d at 470.

Here, however, there are a number of difficult issues which the parties have failed to adequately explore. First, the Court must consider, in view of the actual damages (lost profits) awarded, whether the defendants have made any additional profits that are not accounted for therein. *See Taylor,* 712 F.2d at 1120. Because plaintiff is pursuing this two-pronged recovery, it must show what part of the defendants' profits the plaintiff would not have earned had the infringement not occurred, *i.e.,* the plaintiff must subtract its profits from the defendants' profits, at least on those sales where they directly competed against one another.[8] *Id.* Otherwise, the plaintiff will be overcompensated for its loss. Plaintiff has failed to perform this calculation for the Court. Because, however, of the substantial disparity between the retail prices and corresponding

tion—they were his residual income after all costs necessary to generate the income were subtracted. Costs that would be incurred anyway should not be subtracted, because by definition they cannot be avoided by curtailing the profit-making activity. This principle is well established in the treatment of overhead costs in calculating damages for breach of contract." *Id.* at 1121 (citation omitted). *Taylor* further stated that only overhead costs that were really

variable costs should be taken into account in determining lost profits. *Id.*

8. For the purposes of this discussion, the Court will refer to sales wherein plaintiff's program competed directly with defendants' programs as "competitive sales." Those sales made by the defendant to consumers who found COSTIMATOR to be cost prohibitive will be identified as "noncompetitive sales."

profits made by the plaintiff and defendants on each program sale, it appears exceedingly unlikely that the defendants' profits exceeded plaintiff's profits on competitive sales. Therefore, as to these sales, the plaintiff is not entitled to recover the defendants' profits.

■ Plaintiff also makes a claim for defendants' profits on noncompetitive sales. On these noncompetitive sales, any profit made by the defendants after making the appropriate deductions is recoverable by the plaintiff. While offering evidence as to defendants' gross revenues, neither plaintiff nor defendant has offered any evidence which sets forth a basis for allowing the Court to make a determination of the proportion of defendants' sales that were noncompetitive. As to sales of the RC programs by defendant St. Martin through Chempro Data Sciences Corp., a cursory review of the summary of income and expenses prepared by St. Martin indicates that no profit was made on competitive and noncompetitive sales. This is so even if the Court excludes such expenses as legal fees and discounts other expenses such as "promotion development" and "QC/RC development" which the plaintiff attacks.[9] Therefore, at least as to these sales, plaintiff is not entitled to recover any of the defendants' profits because no profits were generated.

Defendant CAMS's, Laviana's, and Cormier's profits on the sales of the QC III, V, and X programs are not so easily disposed of. On the roughly seventy-eight of these programs from February 1985 through January 1989, these defendants accumulated gross receipts of $37,678. Because the plaintiff has met its burden of showing gross revenues, the burden was on the defendants to show the deductions that should be made from these receipts. In spite of their argument that the defendants' programs competed in an entirely different market than plaintiff's program, these defendants have done very little to set out any basis upon which this Court could differentiate and quantify competitive and noncompetitive sales. Therefore, the Court finds, based on the evidence relating to the marketplace and the types of sales that were made, that fifty percent of the QC sales at issue were noncompetitive and makes adjustments to the revenues and deductible expenses accordingly. See 3 Nimmer § 14.03[B] at 14–27 (doubts as to deductibility should be resolved in plaintiff's favor).

Deductible expenses are those which are specifically linked to and associated with the infringing product. Sygma Photo News, 778 F.2d at 93; 3 Nimmer § 14.03[B] at 14–25. Defendant CAMS has fairly and reasonably apportioned its revenues and expenses between its QC programs and other business ventures and has met its burden of proof in this regard. Certain of those expenses, however, are not deductible. The $754 of taxes is not deductible because the Court has determined that the infringement here was willful. See 3 Nimmer § 14.03[B] at 14–24. The same is true for CAMS' overhead or "allocated expenses" totalling $21,669. See id. at 14–25. Similarly, the $53,075 in legal expenses incurred by CAMS is not deductible because it was not incurred in the efforts to produce or sell the QC programs at issue. Sygma Photo, 778 F.2d at 93. Fifty percent of the remaining expenses, $14,232.50, all of which the Court finds are deductible as relating to the infringing products, should be subtracted from fifty percent of the noncompetitive sales revenues, $18,839. Accordingly, defendant CAMS is liable to the plaintiff for $4,606.50 in profits not accounted for in the award of actual damages to the plaintiff.[10]

9. The Court also rejects the plaintiff's argument that expenses associated with developing program codes that disguised the similarity of the screen displays should not be deductible. There is little evidence about the programming effort or the composition of the codes themselves from which the Court could draw such a conclusion. Second, this argument is overbroad because it seeks to disallow expenses which were directly involved in the production of the infringing programs whose expenditure was necessary if the infringement was to occur.

10. Plaintiff's argument for prejudgment interest on the entire amount of infringement damages, offered without practical support or guidance as

## B) LANHAM ACT DAMAGES

■ In *MTI I*, this Court held that the defendants violated section 43(a) of the Lanham Act by falsely advertising the capabilities of their programs and by falsely representing the origin of their programs and screen displays through the use of a copyright notice. 706 F.Supp. at 1003–04. In order to recover on the false advertising claim, the plaintiff must show that customers were actually deceived by defendants false advertising and that it was injured by their reliance on that advertising. *See Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir.1980); *see also* J. McCarthy, *Trademarks & Unfair Competition*, § 27.5 at 360 (1984). While the showing of actual confusion and injury sufficient to establish a monetary award need not be established with exacting precision, *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 161 (1st Cir.1977), the Court is not allowed to rely on an assumption of lost sales to establish commercial injury. *Invicta Plastics, Ltd. v. Mego Corp.*, 523 F.Supp. 619, 624 (S.D.N.Y. 1981).

■ On the false advertising leg of its Lanham Act damages claim, it is exactly this assumption on which the plaintiff asks this Court to rely. Logically, to show that consumers were actually deceived by the false capability chart contained in the defendants' sales brochure plaintiff must first show that they in fact received that chart. Next, plaintiff must show that because of the two false statements therein the consumer was deceived as to the real capability of defendants' program and elected not to buy plaintiff's program. It is not at all clear from the majority of the customer testimony offered by plaintiff that those customers even received the defendants' brochure with the patently false advertising. Second, that same testimony establishes deception based on the similarity between defendants' programs rather than on false advertising.

Plaintiff established only that Michael McDonald and Michael Stokey received the brochures at issue. However, plaintiff has failed to establish that McDonald received the brochure with the false statements. Moreover, since McDonald stated that he would not have bought COSTIMATOR even if he had not been exposed to defendants' advertising because it "cost[ ] too much," plaintiff has not been damaged or lost this sale. Similarly, though Stokey did appear to receive a brochure with the false statement, and decided to buy a QC X program that did everything listed in the capability chart, and felt that the grid misrepresented the program's capability, his company eventually bought COSTIMATOR. Therefore, plaintiff was not deprived of this sale. For all these reasons, plaintiff may not recover damages on its Lanham Act false advertising claim.

■ Plaintiff is also seeking additional damages in connection with its false designation of origin claim. Plaintiff has demonstrated that at least one consumer was deceived, confused, and induced to purchase defendants' programs in lieu of plaintiff's similar COSTIMATOR program as a result of the defendants' false claim of origin in connection with their computer programs and screen displays. However, the injury devolving from this wrong is fully accounted for in the Court's award of damages on account of copyright infringement. To compensate plaintiff for this claim would be to grant it a double recovery. *See CPG Products Corp. v. Pegasus Luggage, Inc.*, 776 F.2d 1007, 1014 n. 4 (Fed.Cir.1985).

■ Plaintiff also seeks under section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), to recover its reasonable attorneys' fees associated with prevailing on its Lanham Act claims. Plaintiff argues that since it was forced to prove its claim of copyright infringement to succeed on its false designation of origin claim it should be granted attorneys' fees associated with

to how such a sum should be calculated, is rejected. *See Whelan Associates, Inc. v. Jaslow Dental Laboratory*, 609 F.Supp. 1325, 1328 (E.D. Pa.1985) (despite findings of bad faith and mis-

conduct by defendants, exceptional circumstances warranting an award of prejudgment interest were not present).

proving copyright infringement, clearly its main claim. Section 35(a)'s provision for the recovery of attorneys' fees has been held to apply to section 43(a) claims such as the ones plaintiff has proved here. *Centaur Communications v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1229 (2d Cir.1987). However, the prerequisite to recovery of such fees is the determination that a case is "exceptional." 15 U.S.C. § 1117(a). Exceptional cases are those where the defendants' conduct in violating the Lanham Act exhibits willfulness, maliciousness, deliberateness, or fraud. *VIP Foods, Inc., v. Vulcan Pet, Inc.*, 675 F.2d 1106, 1107 (10th Cir.1982). This Court has already determined that the defendants' copyright "infringement was perpetrated with the defendants' actual knowledge of their infringing conduct and therefore was willful." *MTI I*, 706 F.Supp. at 1002. On the basis of all the evidence in this case, the Court sees no reason to alter this finding with respect to the Lanham Act claims. Therefore, the plaintiff is entitled to recover attorneys' fees directly associated with successfully pursuing its Lanham Act claims.

■■■ However, while the Court is aware that the plaintiff's somewhat limited success on the false designation of origin claim was predicated in part on proving copyright infringement, those attorneys' fees expended in proving the copyright infringement claims are not recoverable under the Lanham Act. Because plaintiff failed to register the copyrighted works prior to the commencement of infringement and is precluded under 17 U.S.C. § 412(2) from recovering those fees, it would be improper to allow plaintiff to recover them here, on a claim which is certainly secondary to the copyright claim.

Finally, plaintiff seeks to have the Court exercise its power under section 35(a) of the Lanham Act to increase the damages awarded to plaintiff for the Lanham Act violations to an amount not exceeding three times the award. Equity counsels against any such increase here in light of the substantial award for copyright infringement, the size of that award in relation to the damages suffered under the Lanham Act claims, the discovery sanctions previously entered, and the award of attorneys' fees discussed herein. *See* 15 U.S.C. § 1117(a).

## C) CONNECTICUT UNFAIR TRADE PRACTICES ACT ("CUTPA") DAMAGES

■■■ Plaintiff does not expressly make a claim for damages arising out of defendants' CUTPA violation.[11] Rather, plaintiff seeks to use the CUTPA violation as a vehicle to recover attorneys' fees in the same way that it used the Lanham Act violations.[12] If liability is established under CUTPA, a court may, in its discretion, award the plaintiff attorneys' fees and costs without regard to the amount of recovery. Conn.Gen.Stat. 42–110g(d). Given the relative lack of significance of the CUTPA claim vis-a-vis the other claims asserted, the sizable award for copyright infringement, the discovery sanctions previously entered, and the award of attorneys' fees discussed herein, the Court declines to award any additional attorneys' fees and costs.

## CONCLUSION

The plaintiff is entitled to recover $348,538 in actual damages on account of the defendants' copyright infringement. The plaintiff is also entitled to recover $4,606.50 in profits from defendant CAMS for copyright infringement. The defendants are also liable to plaintiff for its reasonable attorneys' fees directly associated with pursuing its Lanham Act claims, not including those fees expended on proving copyright infringement. Plaintiff shall file with the Court within ten days appropriate affidavits and documentation supporting its claims for such fees. Defendants' shall respond to those submissions not later than

11. To the extent such a claim is implicitly asserted, it is subject to the same proof infirmities as plaintiff's Lanham Act false advertising claim.

12. Again, the Court will not allow the plaintiff to use this theory to recover attorneys' fees expended in establishing its claims of copyright infringement.

seven days thereafter. Judgment may accordingly enter.

SO ORDERED.